UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 17-80193-CIV-MARRA

PATRICIA A. CAMPBELL,

      Plaintiff,

vs.

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,

      Defendant.

_____/

## ORDER AND OPINION ON MOTIONS FOR SUMMARY JUDGMENT

      THIS CAUSE is before the Court upon Defendant's Motion for Summary

Judgment [DE 21] and Plaintiff's Motion for Summary Judgment [DE 23]. The Court

has carefully considered the entire Court file and is otherwise fully advised in the

premises.

**Undisputed Material Facts**[1]

1.      Plaintiff Patricia A. Campbell ("Campbell") brings the present action against

Hartford Life and Accident Insurance Company ("Hartford") pursuant to the Employee

Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001, *et*

*seq.*

---

      [1] Plaintiff's citations to the Administrative Record are designated with the
letters "AR" followed by the stamped page number. Defendant's citations to the
Administrative Record are designated with the letter "H" followed by the stamped or
printed page number.

2.      As an employee of Unify Inc. ("Unify"), Campbell had long-term disability

("LTD") coverage through her participation in an employee welfare benefit plan

known as the Group Long Term Disability Plan for Employees of Unify Inc. (the

"Plan").  H-1017; DE 1, pg. 1-2, ¶¶ 3-5, and pg. 4, ¶ 21.

3.      The Plan was funded through a group policy (the "Policy") issued to Unify by

Hartford, which served as claim administrator for the Plan.  H-978-1021; DE 1, pg. 2,

¶¶ 9, 11.

4.      The Policy identifies Florida as its "Place of Delivery."  H-978.

5.      The Policy states that Hartford has "full discretion and authority to determine

eligibility for benefits and to construe and interpret all terms and provisions."

H-1004.

6.      According to the Policy,

> **Disability or Disabled** means You are prevented from performing one or
> more of the Essential Duties[2] of:
> > 1) Your Occupation during the Elimination Period;
> > 2) Your Occupation for the 24 month(s) following the
> > Elimination  Period . . .; and
> > 3) after that, Any Occupation.

H-1005.

----

[2] Essential Duty is a defined Policy term incorporated into the definition of Disability and "means a duty that (1) is substantial, not incidental; (2) is fundamental or inherent to the occupation; and (3) cannot be reasonably omitted or changed. Your ability to work the number of hours in Your regularly scheduled work week is an Essential Duty."  H-1005.

7.      The Policy further provides, in pertinent part, that if benefits are approved, they will terminate on "the date You are no longer Disabled . . ." H-998.

8.      Prior to claiming disability, Campbell was employed by Unify as a software engineer, a sedentary position that principally required sitting and computer/desk work. H-33, 71, 894-895. Campbell ceased work effective June 12, 2014, and subsequently claimed LTD benefits. H-69, 907-911.

9.      In an Attending Physician's Statement of Continuing Disability ("APS") dated July 10, 2014, treating neurologist Richard Bailyn, M.D. advised Hartford that Campbell had back and spinal operations in 2008, 2009, and 2011, that she could not work without restrictions and that she could not return to work with restrictions. Specifically, Dr. Bailyn concluded that Campbell could not stand longer than 30 minutes and could not sit longer than 30 minutes. H-654.

10.     On August 6, 2014, Dr. Bailyn wrote that Campbell

> has developed progressively disabling low back pain. Her neurologic examination is remarkable for significant loss of mobility at the thoracolumbar region and for distal left lower extremity muscle weakness. The patient reports that sitting or standing for periods of time longer than one hour causes intolerable pain, which is only sometimes relieved by walking. The patient's neurosurgeon, Dr. Barth Green, has determined that no further surgical intervention would be of advantage. The patient has not benefitted from participation in physical therapy, nor from provision of epidural steroid injections. . . In as much as she has exhausted all feasible treatments for management of low back pain, there is no further specific treatment plan available to return her to her functional abilities.

H-655.

11.     To assist Hartford's evaluation of the claim, an independent peer review was

conducted at Hartford's request by board certified neurologist Joseph Jares, M.D.,

who furnished a report dated November 26, 2014.  H-591-600.  Dr. Jares opined that

as of the date she ceased work "to the present date and beyond, the claimant may

perform as follows:  She may sit no more than 30 minutes at one time and no more

than 2 hours total in an 8-hour work shift.  She may stand no more than 10 minutes at

a time and no more than 1 hour total in an 8-hour work shift.  She may walk no more

than 10 minutes at a time and no more than 1 hour total in an 8-hour work shift. . ."

H-598.

12.     Based on Dr. Jares' report indicating Campbell was incapable of full-time

sedentary work, Campbell's LTD claim was approved with benefits effective

December 11, 2014.  H-44, 126-129.

13.     In a follow-up APS dated June 25, 2015, treating neurologist Dr. Bailyn

certified that she could not sit or stand for longer than 30 minutes at a time or for

longer than 2 hours total per day.  H-561-562.

14.     In a treatment note dated September 15, 2015, Dr. Bailyn stated that

"symptoms of lumbosacral radiculopathy are unchanged," but it was also noted that

she "exercises 5-7 days per week and has initiated a weight loss program."  Dr. Bailyn

indicated that he encouraged Campbell to continue exercising and to continue her

efforts to lose weight.  H-552.

15.     In order to assess Campbell's objective functionality, video surveillance was conducted by an investigative firm at Hartford's request on October 6-7, 2015. H-528-535.  Campbell was filmed driving, running errands, and going to the gym.  On October 7, 2015, she was observed (in the words of the investigator) "performing a rowing exercise, working out her arms, working out her shoulders, performing abdominal crunches on a machine, performing calf exercises on a machine, and utilizing an elliptical machine."  H-534.  Campbell was observed continuously using the elliptical machine for over 27 minutes and did not appear to be in pain at any point during the surveillance.  DE 28, H-162.

16.     On November 5, 2015, Campbell was interviewed in her attorney's office by a Hartford investigator, who recorded the interview.  H-917-938.  Campbell informed the investigator, among other things, that she worked out in a gym five days per week, for one hour and 20 minutes per session.  H-920.

17.     On January 28, 2016, Hartford sent the surveillance video, the surveillance investigator's report, and the interview transcript to treating neurologist Dr. Bailyn, with a letter requesting that he consider those materials in conjunction with his medical findings and advise Hartford whether Campbell was capable of full-time work.  H-474-475.  Specifically, Hartford asked Dr. Bailyn to check "Yes" or "No" in response to the following:

> **Specifically, we are asking your medical opinion as to whether Ms. Campbell currently has the functionality to perform activity as follows: 40 hours per week, primarily seated in nature, with**

**occasional walking and standing and[] allows for full use of the upper extremities. Lifting/carrying will be limited to 0-10 pounds on an occasional basis. Afforded will be the opportunity to change positions/postures as needed for comfort (by walking, standing, or moving about).**

H-474 (bold type in original).  On February 1, 2016, _**Dr. Bailyn checked "Yes,"**_ signed the letter and returned it to Hartford.  H-474-475.  He also indicated that Campbell did not have any cognitive restrictions or limitations.  H-475.

18.    In correspondence dated February 17, 2016, Hartford advised Campbell that her LTD benefits were terminated effective February 17, 2016, based principally on the surveillance and Dr. Bailyn's statement that she was capable of full time sedentary work.  H-91-95.

19.    Campbell appealed the termination decision in correspondence dated August 11, 2016.  H-186-198.  Enclosed with the appeal letter were updated medical records evidencing that she underwent shoulder surgery on May 14, 2016, following a fracture sustained in a recent fall.  H-233-236.  There were no reported complications from the surgery.  _Id_.

20.    Also submitted in support of the appeal was a July 18, 2016 Comprehensive Rehabilitation Evaluation and Medical Functional Capacity Assessment conducted at Campbell's request by Craig Lichtblau, M.D., board certified in Physical Medicine & Rehabilitation.  H-281-364.  Dr. Lichtblau listed and considered the extensive diagnostic and surgical procedures Campbell has undergone since 2007.  AR 489-507.  Dr. Lichtblau concluded that Campbell "does not have the functional capacity to work

4 hours per day on an uninterrupted basis at this time."[3]  H-363.  Stating that

Campbell "is going to suffer from acute, intermittent exacerbations of chronic pain

and discomfort," Dr. Lichtblau further opined that it was his medical opinion as a

Board Certified Physiatrist that Campbell would be unable to maintain gainful

employment in the competitive open labor market or in a sheltered work

environment with a benevolent employer secondary to acute, intermittent

exacerbations of chronic pain.  AR 0569.

21.     Dr. Lichtblau noted his opinion that, as Campbell suffers the secondary effects

of aging, her disability will increase over time.  AR 0558.  Dr. Lichtblau did not,

however, have the benefit of Hartford's surveillance video.

22.     To assist Hartford's evaluation of the appeal, an independent peer review was

conducted by Sarah White, M.D., also board certified in Physical Medicine and

Rehabilitation, who reviewed the surveillance video as well as all available medical

records.  H-158-166.  Dr. White's review did not involve a physical personal evaluation

of Campbell.  AR 0632.

23.     On August 31, 2016, Dr. White called Dr. Lichtblau to discuss Campbell's

physical capacity and functionality "from a structural/physical perspective."  Dr.

Lichtblau stated that Campbell had very extensive diagnoses and that Campbell could

not work.  She would "never be going back to work."  Her multiple surgeries were

---

[3] Dr. Lichtblau's examination occurred five months after the termination of benefits and after Campbell had undergone surgery.

unsuccessful.  If Campbell tried to return to work, Dr. Lichtblau stated she would miss many days of work due to pain, and therefore working was not possible.  AR 0634.

24.    Dr. White reviewed the video surveillance performed on October 6-7, 2015, and noted

> [d]uring this time frame, Ms. Campbell was observed walking, driving, carrying a purse over her left arm, carrying an item in her left hand, carrying keys in her right hand, entering a car, exiting a car, carrying a bottle of water with her right hand, carrying a purse over her left shoulder, drinking from a water bottle, entering an Aerobics and Fitness Center, lifting weights on machines, pulling weights in a rowing motion on a weight machine, using a shoulder abduction machine, abducting both shoulders to 90 degrees, using an abdominal crunch machine, using a lower extremity strengthening machine, and using an elliptical machine continuously for 27 minutes and 22 seconds.  During the video surveillance, she did not have any evidence of antalgia during ambulation.  There were no ambulatory assistive devices or visible braces or supports.  Her motions were smooth and fluid and there was no evidence that she was in pain during the observed activities.

H-162.

25.    Dr. White's concern was "whether the diagnoses of cervical, thoracic, and lumbar disc disease, tethered spinal cord, diastematomyelia, [and] release of tethered spinal cord . . . preclude[d] Campbell from performing all activities."  Dr. White concluded, "[i]n weighing all the evidence, despite the inconsistencies, the medical documentation supports partial functional impairment . . .  Restrictions and limitations would include lifting, carrying, pushing, or pulling up to 15 pounds occasionally and 10 pounds frequently as of 2/18/16.  As of 5/13/16 she would have the additional restriction of use of right upper extremity until 11/13/16."  H-164.

26.     Dr. White disagreed with Dr. Lichtblau's opinions regarding Campbell's limited function and work status as noted in his report of July 18, 2016.  She opined, "[t]he findings on the video surveillance are inconsistent with an inability to perform all activities/work."  H-165.

27.     Dr. White noted: "She has no sitting restrictions.  She can stand or walk up to one hour continuously and up to 3 hours total per 8 hour work day.  She should be allowed to change position between sitting, standing and walking as needed for comfort."  *Id*.

28.     Dr. White noted Campbell would have been able to sustain a full-time work schedule on a regular basis as of February 18, 2016, with the restrictions and limitation she noted.  AR 0640.

29.     In a report dated September 8, 2016, Dr. White advised that:

> The observed activities on the video surveillance are inconsistent with an inability to perform all activities.  The inconsistencies with regard to her self-reported inability to work and the findings on the video surveillance lead one to question Ms. Campbell's credibility.  Ms. Campbell's work limitations and restrictions as of 02/18/16 include lifting, carrying, pushing, and pulling up to 15 pounds occasionally and 10 pounds frequently. . .  As of 05/13/16 she would have the additional restriction of no use of right upper extremity until 11/13/16. . .  She has no sitting restrictions.  She can stand or walk occasionally up to one hour continuously and up to 3 hours total per 8 hour work day. . . Within a reasonable degree of medical certainty, claimant would have been able to sustain a full-time work schedule on a regular basis as of 02/18/16 with the restrictions and/or limitations outlined above.

H-165-166; AR 0638.

30.     In correspondence dated September 22, 2016, Hartford notified Campbell of

the decision to uphold on appeal the termination of her LTD claim, based primarily on

the surveillance evidence, Dr. White's review, and treating physician Dr. Bailyn's

confirmation of full-time sedentary work capacity.  H-77-86.  Noting that Dr.

Lichtblau had examined Campbell in July 2016 (subsequent to her May 2016 shoulder

surgery), Hartford explained that Dr. Lichtblau's findings were unlikely to be

representative of her functional abilities when benefits were terminated in February

2016.[4]  H-84, *see* Undisputed Material Facts ("UMF") ¶ 18.

31.     On August 11, 2016, Campbell's counsel sent Hartford a written request to

reverse its decision to cut off Campbell's long-term disability payments previously

provided to Campbell.  AR 0652, *et seq*.  Campbell's appeal noted the supporting

opinions of Hartford's own consultant, Dr. Jares, and of Hartford's in-house

rehabilitation consultant, and that Hartford's decision to discontinue disability

benefits was based on Campbell's course of conservative treatment.  AR 0653.

32.     Campbell's August 11, 2016 appeal letter notes that Campbell told Hartford's

field investigator that she was encouraged by her previous physician to exercise to

attempt to alleviate her pain by strengthening her core and that she had met with a

personal trainer and been instructed how to use the machines.  They had worked out

---

[4] Where, as here, an ERISA claim administrator pays disability benefits for a
time and then terminates them, the Plaintiff must prove that he or she was disabled
at the time benefits were terminated.  *Sobh v. Hartford Life and Accident Ins. Co.*,
658 F.App'x 459, 464-65 (11th Cir. 2016).

a safe routine, which eventually she was able to do on her own. She felt safe, because she could always hang on to something while she used the machines. She had increased the frequency of her workouts but not extended their duration. She sensed some improvement in strength but no significant improvement in her pain. AR 0655.

33.     Campbell's appeal letter noted that Hartford's claim file implied that Hartford had already determined to discontinue Campbell's disability benefits before it asked Dr. Bailyn to agree or not with Hartford's decision.  AR 0657.

**ERISA Standard of Review**

Denials of ERISA benefits are governed by 29 U.S.C. § 1132(a)(1)(B). Under ERISA's civil enforcement provisions, a plan participant may bring a civil action against the plan administrator to recover wrongfully denied benefits due under the terms of the plan.  29 U.S.C. § 1132(a)(1).  In such cases, the insured bears the burden of proving that she is disabled.  *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1247 (11th Cir. 2008).

In reviewing a benefits-denial decision, a district court operates as an appellate tribunal.  *Curran v. Kemper Nat. Servs., Inc.*, No. 04–14097, 2005 WL 894840, at *7 (11th Cir. March 16, 2005) ("In an ERISA benefit denial case ... in a very real sense, the district court sits more as an appellate tribunal than as a trial court. It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan

fiduciary."); *see also, Garrett v. Prudential Ins. Co. of Am.*, 107 F. Supp. 3d 1255,

1264 (M.D. Fla. 2015) ("*Garrett*"); *Crume v. Met. Life Ins. Co.*, 417 F. Supp. 2d 1258,

1272 (M.D. Fla. 2006) ("*Crume*"); *Providence v. Hartford Life & Acc. Ins. Co.*, 357 F.

Supp. 2d 1341, 1342 (M.D. Fla. 2005).  As a result, the usual summary judgment

standard under either Rule 52 or Rule 56 of the Federal Rules of Civil Procedure does

not apply.  *See Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1354 n.4 (11th Cir.

2011); *Crume*, 417 F. Supp. 2d at 1272.

Although ERISA does not prescribe a particular standard of review for decisions

made by plan administrators, there are two possible options: (1) the deferential

arbitrary and capricious standard, which applies when the benefit plan gives the

administrator "discretionary authority to determine eligibility benefits or construe

the terms of the plan," or (2) the *de novo* standard, which applies in the absence of

such discretionary authority.[5]  *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111, 117-19

---

[5] There used to be a third possible standard of review — the heightened
arbitrary and capricious standard — which applied when the administrator was
granted discretion but had a conflict of interest by being responsible for both
reviewing and paying claims. *Compare Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189,
1195 (11th Cir. 2010) with *Buckley v. Metro. Life¸* 115 F.3d 936, 939 (11th Cir. 1997).
The Supreme Court called that standard into question in *Glenn*, 554 U.S. at 128.  The
Eleventh Circuit recognized the Supreme Court's repudiation of the heightened
arbitrary and capricious standard in *Doyle v. Liberty Life Assur. Co. of Bos.*, 542 F.3d
1352, 1359 (11th Cir. 2008) ("*Doyle*"), finding that "the existence of a conflict of
interest should merely be a factor for the district court to take into account when
determining whether an administrator's decision was arbitrary and capricious."  *Id*. at
1360.  Therefore, the sixth step for reviewing an administrator's benefits decision
now reflects that an administrator's conflict of interest is merely a factor taken into
account during the analysis.  *See Garrett,* 107 F. Supp. 3d at  1263-64; *Atherley v.*

(2008) ("*Glenn*"); *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)

("*Firestone*"); *Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1355-56 (11th Cir.

2011) ("*Blankenship*"); *Carr v. John Hancock Life Insur. Co. (USA)*, 703 F.App'x 733,

740 (11th Cir. 2017) ("*Carr*"); *Miller v. Prudential Ins. Co. of Am.*, 625 F. Supp .2d

1256, 1261-62 (S.D. Fla. 2008).  The applicable standard of review ultimately impacts

the six-step[6] analysis for reviewing an administrator's benefits decision:

(1)     Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.*, the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2)     If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end the inquiry and reverse the decision.

(3)     If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4)     If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5)     If there is no conflict, then end the inquiry and affirm the decision.

(6)     If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary

---

*UnitedHealthcare of Fla., Inc.*, 17-cv-332, 2018 WL 1605837, at *2–3 (M.D. Fla. April 3, 2018).

[6] These steps were first established in *Williams v. BellSouth Telecomm., Inc.*, 373 F.3d 1132 (11th Cir. 2004) ("*Williams*") (overruled on other grounds by *Doyle*) and modified in *Doyle* based on the Supreme Court's decision in *Glenn*.  *Blankenship*, 644 F.3d at 1354–55 (citing *Williams*, 373 F.3d at 1137–38; *Doyle*, 542 F.3d at 1359–60).

and capricious.

*Blankenship,* 644 F.3d at 1355 (citing *Capone v. Aetna Life Ins. Co.,* 592 F.3d 1189, 1195 (11th Cir. 2010)).  "Whether the plan administrator's decision was either *de novo* correct or reasonable under this Circuit's *Williams* framework is a question of law." *Id.* at 1354.  Additionally, "[r]eview of the plan administrator's denial of benefits is limited to consideration of the material available to the administrator at the time it made its decision." *Id.*; *Carr,* 703 F.App'x at 740.

**The Standard of Review in This Case**

The Court must first determine what is the standard of review, *de novo* or arbitrary and capricious.  The question of which standard applies is answered by determining whether the Plan granted discretionary authority to Hartford.  The arbitrary and capricious standard of review applies if the administrator has been vested with "discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone,* 489 U.S. at 115; *Alexandra H. v. Oxford Health Ins. Inc. Freedom Access Plan,* 833 F.3d 1299, 1312 (11th Cir. 2016); *HCA Health Servs. of Ga., Inc. v. Emp'rs Health Ins. Co.,* 240 F.3d 982, 993 (11th Cir. 2001), overruled on other grounds by *Doyle v. Liberty Life Assur. Co. of Bos.,* 542 F.3d 1352 (11th Cir. 2008); *Eastman v. Life Insur. Co. of N. Am.,* – F. Supp. 3d –, 17-cv-649, 2018 WL 3688983, at *1 (M.D. Ala. July 26, 2018); *Otero v. Unum Life Insur. Co. of Am.,* 226 F. Supp. 3d 1242, 1260 (N.D. Ala. 2017); *Hunt v. Hawthorne Assocs., Inc.,* 119 F.3d 888, 912 (11th Cir. 1997); *Jett v. Blue Cross & Blue Shield of Ala., Inc.,* 890 F.2d

1137, 1139 (11th Cir. 1989); *Applegate v. Liberty Life Assur. Co. of Bos.*, No. 17-cv-130, 2018 WL 1010839, at *2-3 (M.D. Fla. Feb. 22, 2018).

Here, the parties agree that the Policy unambiguously grants Hartford discretionary authority to construe its terms and determine eligibility for benefits thereunder.  H-1004; DE 21 ¶ 5, DE 32 ¶ 3.  Thus, the Court will begin the analysis at step three of the Eleventh Circuit's framework because "even assuming that [Defendant's] decision was '*de novo* wrong' … the dispositive question is whether [Defendant's] decision was arbitrary and capricious."  *Prelutsky v. Greater Ga. Life Ins. Co.*, 692 F.App'x 969, 972 (11th Cir. 2017); *see also Frame v. Hartford Life & Accident Ins. Co.*, 257 F. Supp. 3d 1268, 1274 (M.D. Fla. 2017), appeal dismissed, No. 17–13096–GG, 2017 WL 4708088 (11th Cir. Sept. 22, 2017).

"When conducting a review of an ERISA benefits denial under an arbitrary and capricious standard (sometimes used interchangeably with an abuse of discretion standard), the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made."  *Glazer v. Reliance Standard Life Ins. Co.*, 514 F.3d 1241, 1246 (11th Cir. 2008).  If there is a reasonable basis, the decision "must be upheld as not being arbitrary or capricious, even if there is evidence that would support a contrary decision," *White v. The Coca-Cola Co.*, 542 F.3d 848, 856 (11th Cir. 2008), *cert. denied*, 556 U.S. 1166 (2009) (internal citation and quotation omitted), or "[if] the court or anyone else might reach a different conclusion."  *Turner v. Delta*

*Family-Care Disability and Survivorship Plan*, 291 F.3d 1270, 1274 (11th Cir. 2002). The administrator's decision "need not be the best possible decision, only one with a rational justification." *Griffis v. Delta Family-Care Disability*, 723 F.2d 822, 825 (11th Cir. 1984). Similarly, if the "evidence is close," the administrator did not abuse its discretion, and the requisite deference compels the affirmance of the administrator's decision. *Doyle,* 542 F.3d at 1363.

A pertinent conflict of interest exists where the ERISA plan administrator both makes eligibility decisions and pays awarded benefits out of its own funds, as in this case. *See Glenn,* 554 U.S. at 112. "The presence of a structural conflict of interest — an unremarkable fact in today's marketplace — constitutes no license, in itself, for a court to enforce its own preferred *de novo* ruling about a benefits decision." *Blankenship*, 644 F.3d at 1356 citing *Glenn*, 554 U.S. at 120 ("The conflict of interest ... is a common feature of ERISA plans.") (Roberts, C.J., concurring in part and concurring in the judgment). "Courts must account for a structural conflict of interest, when one exists, as 'a factor' in the analysis: but the basic analysis still centers on assessing whether a reasonable basis existed for the administrator's benefits decision." *Blankenship*, 644 F.3d at 1355 citing *Conkright v. Frommert*, 559 U.S. 506, 521 (2010). Even where a conflict of interest exists, courts still "owe deference" to the plan administrator's "discretionary decision-making" as a whole.[7]

---

[7] The deference is due both for the administrator's plan interpretations and for his factual determinations. *Blankenship*, 644 F.3d at 1355–56 citing *Torres v. Pittston*

*Doyle*, 542 F.3d at 1363; *see also Glenn*, 554 U.S. at 121 (Roberts, C.J., concurring in part and concurring in the judgment) (noting the "deference owed to plan administrators when the plan vests discretion in them").

Where a conflict exists and a court must reach step six, "the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest." *Doyle*, 542 F.3d at 1360. If "no reasonable basis exists for the decision," then the decision is arbitrary and capricious. *Braden v. Aetna Life Ins. Co.*, 597 F.App'x 562, 565 (11th Cir. 2014) (quoting *Shannon v. Jack Eckerd Corp.*, 113 F.3d 208, 210 (11th Cir. 1997) (internal quotation marks omitted)).

Based on the administrative record in this case, the Court concludes that the plan administrator possessed a reasonable basis for its benefit decision and that Hartford's conflict of interest did not render that decision arbitrary and capricious.

**Discussion**

Plaintiff's motion consists of five pages of history and facts (in addition to a separately filed Statement of Material Facts Not in Dispute), five pages of argument relative to the standard of review,[8] and three paragraphs addressing why the Court

_____

*Co.*, 346 F.3d 1324, 1326 (11th Cir. 2003).

[8] The Court rejects Plaintiff's arguments that the standard of review should be *de novo* based on a Second Circuit opinion that states "a plan's failure to establish or follow the claims-procedure regulation entitles the claimant to have his or her claim reviewed *de novo* in federal court." *Halo v. Yale Health Plan*, 819 F.3d 42, 53 (2d Cir. 2016). The Court need not consider this contention because Campbell has not

should order Hartford to resume paying her LTD benefits (DE 23 ¶¶ 37-39).  Campbell

asserts two arguments in her three paragraphs.  Her first argument is that there was

no "rational reason" for ordering surveillance because she "was being treated

conservatively."  Her second argument is that it is "astonishing" that Dr. White

concluded

> that Campbell had no restrictions as to sitting, allegedly based on video
> surveillance of less than 38 minutes over two days where by the peer
> reviewer's own account about 23 minutes of the video was taken up
> with Campbell's using an elliptical machine.  The video scarcely shows
> Campbell in a seated position at all.  How one could reject Campbell's
> well documented complaints of pain in her low back based on the video
> surveillance is impossible to surmise.  Indeed, Campbell herself gave a
> full and detailed account of Dr. Green's initially recommending core
> strengthening and other exercise and how she had worked with a
> personal trainer to develop a safe set of exercises which she could
> perform without endangering herself.

DE 23 at 11-12.

Plaintiff's claim of disability rests on her assertion that she cannot perform her

_____

supplied any evidence to support a conclusion that a regulatory infraction occurred.
Campbell's second argument in support of *de novo* review is that the Policy, being
issued by a California "Employer/Plan Sponsor," is subject to California's ban on
discretionary provisions in disability insurance policies.  *Orzechowski v. Boeing Co.
Non-Union Long-Term Disability Plan, Plan No. 625*, 856 F.3d 686, 695 (9th Cir. 2017)
(ERISA did not preempt California Insurance Code § 10110.6 making discretionary
language in insurance plans void and unenforceable).  This argument is rejected.
The California statute deems "void and unenforceable" any discretionary provision
contained in a policy "that provides or funds . . . disability insurance coverage for any
*California resident*."  Cal. Ins. Code § 10110.6(a) (emphasis added).  Thus, by its own
express terms, the statute applies only to California residents.  Plaintiff claims to be
a resident of Palm Beach County, Florida, not California.  DE 1, ¶2.  Accordingly, the
holding in *Orzechowski* does not apply here.

sedentary job because of disabling pain while sitting.  However, an ERISA disability is not established "merely by the existence of pain, even chronic pain, in the absence of proof that the claimant's pain actually precludes him or her from working." *Richey v. Hartford Life and Acc. Ins. Co.*, 608 F. Supp.2d 1306, 1310 (M.D. Fla. 2009) ("*Richey*").  Campbell therefore cannot meet her burden merely by pointing to her diagnoses and complaints of pain; rather, she must demonstrate that her symptoms precluded her from working in her own occupation.

The United States Department of Labor recognizes five categories of work with respect to the degree of physical exertion required.  *Richey*, 608 F. Supp. 2d at 1311 n.2.  The categories (in order from least demanding to most) are:  sedentary, light, medium, heavy, and very heavy.  *Id.*  These categories are routinely used by administrators, physicians, and courts in the ERISA disability context.  *Id.*  If a claimant's occupation is at the sedentary level and she is "capable of performing a sedentary job," then the "termination of [her] LTD benefits" is proper.  *Howard v. Hartford Life and Acc. Ins. Co.*, 929 F. Supp. 2d 1264, 1293 (M.D. Fla. 2013), *aff'd*, 563 F.App'x 658 (11th Cir. 2014) ("*Howard*").  Accordingly, since Campbell's occupation is sedentary in its requirements, she must prove her inability to perform sedentary work on a full-time basis.

## The Surveillance Evidence and Peer Review

It is not "irrational" for an ERISA claim administrator to document a claimant's objective functional capacity via video surveillance, and to terminate LTD benefits

when the surveillance discloses activities that substantially exceed the claimant's reported functionality. *Howard*, 929 F. Supp. 2d at 1299-1300. It is also not unreasonable to have surveillance evidence reviewed and analyzed by a consulting physician, and to rely on the consulting physician's assessment of the claimant's work capacity based on the surveillance and the claimant's medical records. *Id.* at 1300 (ruling it was "neither wrong nor unreasonable for Hartford to submit Plaintiff's medical history and the surveillance video to the independent reviewing healthcare professionals for their review"); *Richey*, 608 F. Supp. 2d at 1312 (an ERISA claim administrator is "entitled to rely on the opinion of a qualified medical consultant who neither treats nor examines the claimant, but instead reviews the claimant's medical records").

In the present case, the surveillance video disclosed Campbell exercising vigorously in a gym for a sustained period, an activity she admittedly engaged in regularly. UMF ¶ 16. Peer reviewer White specifically confirmed that Campbell's documented activity level was inconsistent with her reported limitations and wholly consistent with full-time work capacity. *Id.*, ¶ 29. Based on the surveillance and Campbell's medical records, Dr. White provided restrictions and limitations that were consistent with the ability to perform sedentary work. *Id.* It was not unreasonable for Hartford to rely on Dr. White's report in making its final decision to terminate benefits. *See Vivas v. Hartford Life and Acc. Ins. Co.*, 49 F. Supp. 3d 1124, 1127-28 (S.D. Fla. 2014) (affirming termination of LTD benefits where reviewing physicians

observed that surveillance showed plaintiff's ability to "participate in exercises in a fitness gym for approximately one hour" with no visible impairment, which was "not consistent with [plaintiff's] reports of his functional abilities"); *Howard v. Hartford Life and Acc. Ins. Co.*, 563 F.App'x 658, 663 (11th Cir. 2014) (affirming summary judgment for administrator and holding that administrator, in terminating benefits, was "entitled to rely on the reviewing health care professionals' assessment of [plaintiff's] capabilities which were based on her medical records and the surveillance video").

### Campbell's Own Treating Neurologist

"Under well-settled ERISA law," a claim administrator's reliance on a medical peer review is "entirely appropriate even where the reviewing consultant's report rebuts the opinion of the treating physicians asserting claimant is disabled." *Ness v. Aetna Life Ins. Co.*, 257 F. Supp.3d 1280, 1291 (M.D. Fla. 2017) (citation omitted). Thus, Hartford's reliance on Dr. White's report is not improper even if one or more of Campbell's *treating* physicians had disagreed. However, Campbell's own treating neurologist, Dr. Bailyn, changed his opinion after reviewing the surveillance video, and checked a box indicating his opinion now was that Campbell was capable of full-time sedentary work. UMF, ¶ 17.

Dr. Bailyn's opinion lends strong additional support to Hartford's decision. *See Cusumano v. Continental Cas. Co.*, No. 6:07-CV-141, 2008 WL 1711405, *9 (M.D. Fla., Apr. 10, 2008) (affirming termination of benefits where treating physician who had

previously vouched for plaintiff's alleged disability "changed his mind upon seeing the [surveillance] video and considered Plaintiff to be capable of sedentary work"); *Sanzone v. Hartford Life and Acc. Ins. Co.*, No. 06-61135, 2008 WL 80984, *10 (S.D. Fla. Jan. 3, 2008) (affirming termination of benefits where plaintiff's primary treating physician "signed a letter … indicating his approval of [administrator's] determination that Plaintiff could return to a full-time sedentary occupation").

Dr. Lichtblau's opinion that Plaintiff was incapable of consistent full-time work does not make Hartford's final decision to terminate LTD benefits wrong. *See Vivas*, 49 F. Supp. 3d at 1135 (entering summary judgment for administrator where the same Dr. Lichtblau opined during plaintiff's appeal that plaintiff lacked work capacity). In addition, Dr. Lichtblau did not have the benefit of the surveillance video, thus further diminishing the weight to be accorded his opinion. *See Kiloh v. Hartford Life Ins. Co.*, No. 8:04-cv-1741, 2005 WL 2105957, *14 (M.D. Fla. Aug. 31, 2005) (ruling that administrator was "not wrong" to give less weight to opinions of physicians who "had not seen the video surveillance of Plaintiff" and to instead credit opinion of peer reviewer "who did see the video surveillance").

## Conclusion

Campbell's ability to perform full-time sedentary work was confirmed by her own treating neurologist, and a board certified peer reviewer subsequently concurred. Hartford reasonably relied on those medical opinions and the surveillance evidence in deeming her ineligible for continued benefits. Hartford's decision to

terminate LTD benefits was rationally justified and thus is not arbitrary and

capricious, entitling Hartford to summary judgment.

In accordance with the findings herein, it is hereby

**ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment [DE

21] is granted and Plaintiff's Motion for Summary Judgment [DE 23] is denied.

In accordance with Fed. R. Civ. P. 58, final judgment will be entered by

separate order.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County,

Florida, this 15th day of October, 2018.

_____
KENNETH A. MARRA
United States District Judge